# MOTION TO INCREASE WRONGFUL-INJUNCTION BOND

# AND MEMORANDUM OF LAW IN SUPPORT

**Seakeeper, Inc. v. Starboard Yacht Group, LLC**

**United States District Court for the District of Maryland**

**Case No. 1:26-cv-01332-MJM**

**District Judge: Hon. Matthew J. Maddox**

_____

_____

**PROPOSED INTERVENOR,**

**Charles Jacob Stratmann,**

**Movant, Pro Se.**

_____

_____

**MOTION TO INCREASE THE WRONGFUL-INJUNCTION BOND PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 65(c)**

**AND MEMORANDUM OF LAW IN SUPPORT**

_____

_____

TO THE HONORABLE MATTHEW J. MADDOX, UNITED STATES DISTRICT JUDGE:

Proposed Intervenor Charles Jacob Stratmann ("Movant") respectfully moves pursuant to Federal Rule of Civil Procedure 65(c) to increase the wrongful-injunction bond from its nominal and grossly inadequate $12,000 to an amount not less than **$555,000** to secure the direct replacement value of the physical Seakeeper inventory currently frozen or stolen under the shadow of the Preliminary Injunction, or in the alternative, to dissolve the injunction as to those assets.

Movant Charles Jacob Stratmann files this Motion strictly in his individual capacity as a proposed intervenor pro se under Fed. R. Civ. P. 24(a)(2) to preserve critical rights and prevent irreparable harm, pending any formal appearance of counsel for the entity. Movant's intervention of right is pending before this Court (DE 36) to protect his personal property interests as the sole owner and personal guarantor of the capital used to purchase the enjoined assets. Because Starboard Yacht Group, LLC ("SYG") is currently unrepresented and unable to appear pro se, Movant appears individually to protect his homestead, which is currently in foreclosure due to the default on the SBA EIDL loan he personally guaranteed to fund the very Seakeeper inventory Seakeeper has now frozen. While the total enterprise capital at risk exceeds **$2.5 million**, Movant limits his immediate bond request to the **$555,000** hardware replacement cost of the frozen and stolen inventory.

_____

_____

# I. STATEMENT OF FACTS

## A. The Preliminary Injunction and Its Harm

1. On May 12, 2026, this Court entered a Preliminary Injunction against SYG in favor of Seakeeper, Inc. ECF No. 26.

2. The Preliminary Injunction has functionally crippled SYG's ability to operate its marine services business, rendering valuable inventory stranded and non-performing.

3. The current bond amount of $12,000 bears no reasonable relationship to the actual harm SYG has suffered and continues to suffer as a direct consequence of the injunction.

## B. SYG-Funded Seakeeper Inventory — Serial-Specific Reconciliation

4. SYG purchased and funded Seakeeper gyroscopic stabilization units using SYG capital or capital personally guaranteed by Movant. The accompanying Declaration of Charles Jacob Stratmann (Exhibit A) provides a serial-specific reconciliation reflecting the current best record:

**Category A: AT-RISK / Recoverable (not in SYG's possession, but traceable)**

| Unit | Serial | Approx. Value | Status | Evidence |
|---|---|---|---|---|
| SK26 | 26-221-0589 (per SYG purchase records, CON 000158; not in manufacturer D-82) | **$268,600** (current Seakeeper MSRP, June 2026; originally purchased ~$265,000) | Stolen — Rick Pineiro/Ares Marine; Dania Beach grand-theft investigation pending recovery (Det. Vecchio) | BSO Axon #02-2601-000152; CON 000158 |
| SK35 | 35-212-0428 | ~**$247,200** (per-unit price ≈ $192,028; D-82 net after credits = $214,011.80; current authorized dealer retail ~$190,000+ — USA Stabilizers pricing, June 2026) | **CONTRADICTION** — Seakeeper's own General Counsel says it is "still installed on the boat" (314-3, Lavorato email, July 16, 2024). Ivankovich testified under oath it was stolen and is in a Fort Lauderdale warehouse. Private investigator confirmed warehouse location. Unit was sold by Tom Ackel (Ackel Marine) through a fraudulent failed service of process, a sham writ | 314-3 (Lavorato); Madison D-82; Ivankovich trial testimony (CMR trial 2/23/2026); FLPD #34-2512-209096 (Det. Somma); PI location confirmation |

| | | | of possession with a $0 final judgment, and a fraudulent auction. Florida State Judge Woody stated on the record that grand theft is outside his jurisdiction and directed Movant to seek the State Attorney for criminal prosecution. D-82 itself cross-labels 0432/0428 on p.2 (RA 8589). | |
|---|---|---|---|---|

**Category B: RETURNED / Disclosed (not claimed as bond item)**

| Unit | Serial | Credit Amount | Status | Evidence |
|---|---|---|---|---|
| SK35 | 35-212-0433 | $170,004.20 | Returned to Seakeeper as warranty credit. Not claimed as bond item. Fully disclosed. | 314-3 (Lavorato); Madison D-82 |
| SK35 | 35-212-0432 | $192,068 | Returned to Seakeeper as warranty credit (Case #45437), then shipped to Tri Sea (SO 68531, January 2024). Not claimed as bond item. Fully disclosed. D-82 p.2 cross-labels this RA 8589 as "(Unit 35-212-0432)... Serial 35-212-0428" — manufacturer internal scramble. | 314-3 (Lavorato); Madison D-82; SYG-105822 to 105827 |

**Category C: IN SYG'S POSSESSION (factory-sealed service parts)**

| Item | Description | Approx. Value | Status | Evidence |
|---|---|---|---|---|
| Factory-sealed SK service parts | Bearings, seals, vacuum pumps, control modules, cooling components — new-in-box Seakeeper OEM parts | $75,000–$100,000 | Held in SYG possession; cannot sell or install due to injunction; dealer-exclusive, no liquidation market | Verified inventory count; purchase documentation |
| Installation tooling | Specialized marine gyro installation cranes, rigging, mounting hardware, alignment equipment, certified technician tools | **$150,000+** | Cannot be used for non-Seakeeper work; value tied to dealership; cannot liquidate to non-Seakeeper buyers | Equipment purchase records; vendor invoices |
| Seakeeper-authorized training | Factory technician training, dealer certification programs, ongoing technical education for SYG staff | **$250,000+** | Non-transferable to non-dealers; renders worthless if dealership terminated; SYG invested heavily to meet Seakeeper's dealer standards | Training invoices; Seakeeper certification records |
| Dealer marketing & brand build | Website development, SEO, trade show presence, co-branded marketing materials, lead generation campaigns to establish SYG as Seakeeper dealer | **$600,000+** | SYG-specific marketing investment destroyed by Seakeeper's termination; not recoverable | Marketing invoices; agency contracts; campaign records |
| Demo vessels (2) | Two dedicated demonstration vessels equipped with Seakeeper gyros for sea trials and client demonstrations | **$1,000,000+** | Vessels purchased/modified specifically for Seakeeper demos; residual value dependent on Seakeeper relationship; cannot demo without | Vessel purchase/modification records; demo logs |

| | | | active dealer status | |
|---|---|---|---|---|
| Dealer-certified diagnostic equipment | Seakeeper-authorized diagnostic and calibration tools | $10,000–$15,000 | Non-transferable to non-Seakeeper dealers; renders worthless if dealership terminated | Dealer agreement; equipment records |

5. To ensure absolute candor regarding physical possession, the direct physical assets frozen in SYG's warehouse (Category C) total exactly **$96,400** ($81,400 in factory-sealed service parts and $15,000 in diagnostic tools). The wrongfully withheld units representing traceable replacement exposure (Category A) total **$515,800** ($268,600 for SK26 and $247,200 for SK35). Together, the combined direct hardware exposure at stake under the shadow of this injunction is exactly **$612,200**. The requested direct hardware bond floor of **$555,000** represents a highly conservative, even-numbered security request that represents a substantial discount below our actual direct hardware exposure. Sunk infrastructure capital (estimated at **$2.0 million**) is reserved separately.

   To assist the Court, the following table summarizes the dual-tier valuation of stranded inventory versus total at-risk enterprise investment:

**Table 1: Bond Math Summary (Direct Hardware vs. Enterprise Exposure)**

| Category | Asset Description | Direct Hardware Bond Ask (Floor) | Total Enterprise Capital Exposure | Source/Evidence Basis |
|---|---|---|---|---|
| **Category C** | Factory-sealed OEM parts inventory (In-hand) | $81,400 | $100,000 | Verified warehouse physical inventory count |
| **Category C** | Dealer-certified diagnostic tools (In-hand) | $15,000 | $15,000 | Seakeeper-certified engineering diagnostic tools |
| **Category A** | Seakeeper 26 Unit (S/N 26-221-0589) (Replacement Exposure) | $268,600 | $268,600 | Current MSRP; purchase record (CON 000158) |
| **Category A** | Seakeeper 35 Unit (S/N 35-212-0428) (Replacement | $247,200 | $247,200 | Seakeeper list price ($309K) less 20% promo discount |

| | | | | |
|---|---|---|---|---|
| | Exposure) | | | |
| **Category C** | Dealer installation tooling & cranes | — | $150,000+ | Backup: AF Export Genie 1056 Equipment Invoices |
| **Category C** | Seakeeper Factory technician training | — | $250,000+ | Sunk capital training invoices & certifications |
| **Category C** | Authorized dealer marketing & SEO build | — | $600,000+ | 6-year co-branded marketing; SYG database |
| **Category C** | Custom Seakeeper Demo vessels (2) | — | $1,000,000+ | Paul Anster survey reports (DEMO_BOAT_SURVEY_15255B/6B) |
| **TOTALS** | **In-Possession Floor & Replacement Exposure** | **$555,000** | **$2,597,612** | **Bond Demand Floor vs. Audited Capital Exposure** |

   **Critical context:** The SBA EIDL loan that Movant personally guaranteed — now in default and exposing his family homestead to foreclosure — funded Seakeeper inventory. The loan proceeds went into Seakeeper's pocket. Seakeeper received the capital, then terminated SYG's dealership and sued SYG for the very units the EIDL paid for. Movant is now personally liable for the defaulted loan while Seakeeper holds both the purchase price and the injunction freezing the assets.

   This figure does not include lost installation revenue (~10–15% of unit cost per install), warehouse carrying costs, depreciation of non-operational equipment, reputational harm to SYG's dealer relationships, or the personal financial collapse of Movant from the SBA EIDL default on his homestead.

### C. The Three-Party Settlement — May 2022

6. In May 2022, Movant brokered a resolution of Steven Ivankovich's Cobia 33DC Seakeeper SK2 warranty dispute. The settlement architecture was:

| Party | Obligation | Evidence |
|---|---|---|
| Ivankovich | Purchase three SK35 units for | SYG-105854 (Chase Russell |

| | Octopussy before July 1 price increase | email); Estimate #2009-7329 ($983,729.30) |
|---|---|---|
| Seakeeper | Warranty/replace defective SK2 on Cobia 33DC | SYG-105854 |
| CJS/SYG | Purchase one SK26 dealer stock (~$265,000) | CON 000158 |

7. Movant personally funded the SK26 using SBA EIDL capital — a COVID-relief loan personally guaranteed by his family homestead at 545 NE 17th Avenue, Fort Lauderdale, Florida. That homestead is now in foreclosure.

## D. Seakeeper's Contradictory Claims

8. Seakeeper claims SYG "stole" an SK35 unit. Seakeeper's own records show that the unit is not stolen. In terms of valuation, Seakeeper's last remaining SK35 unit was sold at list price for **$309,000**, while Salty Marine offered a promotional 20% discount on the unit resulting in a verified replacement floor of **$247,200** (representing the exact direct hardware replacement value of the unit). With the SK35 platform no longer in production, the closest commercially available replacement is the SK40 platform, which commands materially higher pricing, confirming that Movant's valuation remains highly conservative.

9. On July 16, 2024, John Lavorato, Vice President and General Counsel of Madison Industries (Seakeeper's parent company), emailed Caycie Flitman at Moore & Co. (CMR's counsel) in response to a subpoena. The email states:

> "Starboard paid $576,084 for 3 SK35s shipped 6/29/2022. (Serials 35-212-0428, 35-212-0432, 35-212-0433)."

> "Starboard returned Unit 35-212-0433 for credit of $170,004.20 and Unit 35-212-0432 for credit of $192,068.00."

> **"As far as we know Unit 35-212-0428 is still installed on the boat."**

Source: CMR DE 314-3 (FLSD Docket 03/13/2026), Bates SYG-106744.

10. Seakeeper's own General Counsel admits under subpoena that Unit 35-212-0428 is "still installed on the boat." Seakeeper cannot simultaneously claim SYG "stole" a unit that their own records show is "still installed." If the unit is "still installed," SYG never had possession of it to "steal" it. The injunction requires SYG to "return" a unit that Seakeeper admits is still on the boat — an impossibility.

10.1. **The Tom Ackel / Salty Marine Fraudulent Disposal Scheme:** The actual disposition of SK35 serial `35-212-0428` is a matter of state-court fraud. The unit was stolen and fraudulently sold by Tom Ackel (Ackel Marine / Salty Marine) through a scheme utilizing a fraudulent "failed service" of process, a sham "writ of possession only" based on a $0.00 final judgment, and a fraudulent mock auction.

10.2. **Florida State Court Findings before Judge Woody:** When this fraudulent state-court execution scheme was brought directly before Florida State Court Judge Woody, Judge Woody stated on the record that "grand theft is outside my jurisdiction" and explicitly directed Movant to seek the State Attorney for criminal prosecution of Tom Ackel. These events prove that the unit is gone due to third-party fraud, and the federal injunction commanding its return forces a physical impossibility.

11. On January 9-10, 2024, Seakeeper personnel confirmed the SK35 unit 35-212-0432 was returned as a warranty case. A Credit Memo was issued for $192,068 (Case #45437). TriSea picked up the unit with Seakeeper's knowledge. Source: SYG-105822 to 105827.

12. In May 2022, Seakeeper's own representative, Chase Russell, resolved Ivankovich's Cobia 33DC SK2 warranty dispute by email (SYG-105854): "We are working closely with our Support Team to provide a solution for you as soon as possible to either replace the components on the unit or provide you with a complete unit."

   **The three SK35 units were not a retail sale by SYG — they were a Seakeeper manufacturer warranty remedy.** Seakeeper shipped the units directly (D-82, p.1: "Starboard paid $576,084 for 3 SK35s shipped 6/29/2022"). SYG was the funding intermediary, not the seller. Chase Russell (Seakeeper employee, not SYG) arranged the remedy bundle to settle Ivankovich's SK-2 product liability claim against Seakeeper. A warranty remedy accepted by the beneficiary to drop his lawsuit cannot be recharacterized as a "forced retail sale" by the funding conduit.

13. Seakeeper now sues SYG for damages it never suffered — because Movant prevented the very litigation Seakeeper claims justifies this injunction.

### E. Seakeeper-Record Contradictions Undermine the Injunction's Foundation

14. The Seakeeper-filed record in this case contains internal contradictions that undermine the basis for the injunction:

   a. **The SK35 "theft" claim** is contradicted by Seakeeper's own General Counsel, who admits under subpoena that the unit is "still installed on the boat" (314-3, Lavorato email, July 16, 2024). A plaintiff cannot obtain an injunction forcing a defendant to "return" a unit that the plaintiff's own records show the defendant never possessed.

   b. **The SK35 unit 35-212-0432** was returned as a warranty case with Credit Memo 1682 ($192,068) and shipped to TriSea with Seakeeper's knowledge. SYG-105822 to 105827.

   c. **The Cobia warranty damage claim** is contradicted by Seakeeper's own representative Chase Russell, who resolved the warranty dispute by offering to "replace the components on the unit or provide you with a complete unit." SYG-105854.

15. Movant respectfully directs the Court's attention to additional documentary evidence showing that the representations underlying this injunction are inconsistent with the verified record:

   a. Ivankovich's project manager confirmed eight Seakeeper units across six vessels (SKR-000007, July 6, 2023).

   b. Ivankovich's own email to Caycie Flitman at Moore & Co. (SYG-105876, March 22, 2024) documents six vessels and $791,835.93 in work.

   c. Yet at trial, Ivankovich testified under oath that he had "Zero" Seakeeper units (Trial Transcript 122:5-6, CMR bench trial 2/23/2026).

   d. **Keystone admission:** At the same trial, Ivankovich admitted under oath that a SK35 unit was "essentially stolen and based on the work of our investigator is sitting in a Fort Lauderdale warehouse" (Trial Transcript 85:23-86:7). This is the same unit that Seakeeper's own General Counsel says is "still

installed on the boat" (314-3). The enterprise's witness and the enterprise's manufacturer cannot both be telling the truth.

  e. **"Begged us for the business":** Ivankovich also testified that SYG "essentially begged us for the business" (Trial Transcript 93:1-3). This contradicts any claim that SYG "forced" him to purchase units. It is also chronologically impossible: SYG had already earned Seakeeper's "Dealer of the Year" award in 2021 — a full year before the May 2022 SK35 purchases. A "Dealer of the Year" does not "beg" for business a year after receiving the highest dealer recognition.

  f. **"Dealer of the year status":** Ivankovich further acknowledged that SYG had "dealer of the year status" and that units were "just stored in his facility" (Trial Transcript 84:19-85:1). This rebuts any claim that SYG was an unauthorized thief rather than a legitimate dealer.

  g. **"Zero" units — yet he hired a private investigator:** Ivankovich testified he had "Zero" Seakeeper units (Trial Transcript 122:5-6). Yet in the same testimony he admitted hiring a private investigator who located a stolen SK35 "in a Fort Lauderdale warehouse" (Trial Transcript 85:23-86:7). No one hires a PI to recover worthless property. The act itself is an admission of value — approximately $190,000 — that destroys both the "Zero units" testimony and the "worthless inventory" theory.

  h. **The Saint Tony / Moore Paradox:** In December 2022, Michael T. Moore (CMR's counsel) filed a case in the Southern District of Florida (Saint Tony) in which he named SYG as Seakeeper's authorized expert and dealer (DE 37, ¶37). Yet months later, Moore manufactured CMR claims that SYG "failed to perform" and had no legitimate dealer relationship. Moore cannot simultaneously certify SYG as Seakeeper's expert in one federal case and then deny that relationship in another. SYG-105795 to SYG-105801.

16. When an injunction is sought based on representations that the movant's own documentary record — and the movant's own sworn witness — contradict, the risk of wrongful enjoinment is heightened and the bond must reflect that risk.

_____

_____

## II. LEGAL STANDARD — FRCP 65(c)

17. Federal Rule of Civil Procedure 65(c) provides:

> "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

18. The purpose of the bond is to compensate the enjoined party if the injunction is later determined to have been wrongfully issued. *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999) (the district court "must fix a bond in an amount that it considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined").

19. While the amount of the bond is within the discretion of the district court, the court must require security that covers the probable damages that the enjoined party will suffer if the injunction is later dissolved. *See Ciena Corp. v. Jarrard*, 203 F.3d 312, 326 (4th Cir. 2000) (Rule 65(c)'s bond requirement is mandatory, although the court has discretion to set the amount).

20. When the enjoined party demonstrates that the bond is grossly inadequate to compensate for the actual harm being suffered, the court has the authority — and the duty — to increase it. *See District 17, United Mine Workers of America v. A & M Coal Co.*, 917 F.2d 136, 141 (4th Cir. 1990) (bond must be set in an amount sufficient to secure the defendant's potential losses).

20.1. **No Ratification under Common-Law Duress:** Under Florida law (*City of Miami v. Kory*, 394 So. 2d 494, 497 (Fla. 3d DCA 1981)) and Maryland law (*Shillman v. Hobstetter*, 249 Md. 678, 241 A.2d 570 (1968)), commercial duress is established where a party is forced to assent to a transaction by an improper threat that leaves no reasonable alternative. Performance under such economic coercion to protect preexisting reputation and client relations does not constitute legal ratification or voluntary commercial assent.

20.2. **Evidentiary Hearing Required on Unliquidated Default Damages:** Federal courts are under an absolute obligation to assure there is a legitimate basis for any damages awarded on a default, and may not enter a final judgment without an evidentiary hearing unless the damages are liquidated or the record contains clear, uncontroverted calculations. *See Anheuser-Busch, Inc. v. Philpot*, 317 F.3d 1264, 1266 (11th Cir. 2003).

_____

_____

## III. ARGUMENT

### A. The $12,000 Bond Is Grossly Inadequate

21. The current bond of $12,000 bears no reasonable relationship to the verified harm caused by this injunction. The at-risk capital exceeds the bond by a factor of **212×**. The bond does not account for:

   a. The verified replacement value of complete gyro units: **$515,800** ($268,600 for SK26 + $247,200 for SK35 net remaining exposure);

   b. The verified value of dealer-exclusive parts inventory, tooling, training, marketing, and demo vessels: **$2,085,000+**;

   c. The SBA EIDL loan that funded Seakeeper inventory and now defaults against Movant's homestead because the injunction prevents SYG from monetizing the assets;

   d. Lost installation revenue (industry standard: 10–15% of unit cost per install × halted jobs);

   e. Warehouse carrying costs and time-value of capital tied up for 36+ months;

   f. Depreciation of specialized marine equipment while non-operational;

   g. Reputational harm to SYG's dealer relationships;

   h. The personal financial collapse of Movant, who personally guaranteed the SBA EIDL used to fund Seakeeper inventory.

22. A bond that covers approximately **1.9%** of the direct hardware exposure ($12,000 ÷ $612,200) is not "security" within the meaning of Rule 65(c). It is a nominal gesture that leaves SYG effectively unprotected. *See Life Spine, Inc. v. Aegis Spine, Inc.*, No. 19-cv-07092, 2021 WL 1090208 (N.D. Ill. Mar. 19, 2021) (court ordered $6,000,000 bond reflecting full commercial value of enjoined product line).

22.1. **Enterprise Context — Irreparable Spoliation of R&D Datasets:** While Movant has strictly limited the requested Rule 65(c) bond floor to the **$555,000** direct physical hardware count, the broader

enterprise exposure of **$2.0M+** includes two specialized demonstration vessels (Everglades and Pursuit) that function as a comparative-dataset R&D project.

The Everglades vessel integrates a Seakeeper gyro with Humphree interceptor technology to capture gyro-plus-interceptor performance data. The Pursuit vessel integrates a Seakeeper gyro with Seakeeper Ride technology to capture gyro-plus-Ride performance data. Together, these two hulls represent the physical, side-by-side R&D embodiment of the SVICM ride-control methodology.

If these vessels are lost or refitted out of foreclosure due to the ongoing economic restraint, this comparative-dataset embodiment will be permanently destroyed. In the Fourth Circuit, this represents the permanent loss and spoliation of unique physical evidence. *See Silvestri v. General Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001) (defining spoliation as the destruction or material alteration of evidence, or the failure to preserve property for another's use as evidence). While this R&D spoliation risk is presented as critical context for a separate preservation request, it underscores the catastrophic, irreversible economic consequences of leaving the current $12,000 bond uncorrected.

## B. Seakeeper's Claims Rest on Contradictory and False Representations

23. Seakeeper's application for this injunction relied on representations that the Seakeeper-filed documentary record contradicts:

   a. **The SK35 "theft" claim** is contradicted by Seakeeper's own General Counsel, who admits the unit is "still installed on the boat" (314-3, Lavorato email). A plaintiff cannot enjoin a defendant to "return" a unit the plaintiff admits the defendant never possessed.

   b. **The SK35 unit 35-212-0432** was returned as a warranty case with Credit Memo 1682 ($192,068) and shipped to TriSea with Seakeeper's knowledge. SYG-105822 to 105827.

   c. **The Cobia warranty damage claim** is contradicted by Seakeeper's own representative Chase Russell, who resolved the warranty dispute by offering to "replace the components on the unit or provide you with a complete unit." SYG-105854.

d. **The unit-count representations** are contradicted by Ivankovich's own emails documenting six vessels and $791,835.93 in work (SYG-105876–105877) and by his project manager's confirmation of eight Seakeeper units across six vessels (SKR-000007, July 6, 2023).

e. **The "worthless inventory" theory** is contradicted by Ivankovich's own sworn testimony: he claims "Zero" units (Tr. 122:5-6), yet admits he hired a private investigator to recover a stolen SK35 unit worth approximately $190,000 (Tr. 85:23-86:7). No one spends money on a PI to find worthless property.

f. **The "begged for business" claim** is chronologically impossible: SYG earned Seakeeper's "Dealer of the Year" award in 2021 — a full year before the May 2022 SK35 purchases. A top-recognized dealer does not "beg" for business it has already earned. Tr. 93:1-3; Tr. 84:19-85:1; 314-2; Estimate #2009-7329.

g. **The Saint Tony / Moore Paradox:** In December 2022, Moore certified SYG as Seakeeper's authorized expert and dealer in federal court (Saint Tony DE 37, ¶37). Months later, Moore manufactured CMR claims that SYG "failed to perform" and had no legitimate dealer relationship. A lawyer cannot vouch for a dealer relationship in one case and then deny it in another. SYG-105795 to 105801.

24. When an injunction is sought based on representations that the movant's own documentary record contradicts, the risk of wrongful enjoinment is heightened and the bond must reflect that risk. *See In re Baker*, 744 F.2d 1438, 1441 (10th Cir. 1984); *Stanley v. University of Southern California*, 13 F.3d 1313, 1321 (9th Cir. 1994).

## C. Pattern Context

25. Movant respectfully notes that the factual inconsistencies in Seakeeper's claims are not isolated. The following parallel proceedings involve related actors and similar conduct patterns:

a. In Contessa Marine Refit, LLC v. Seinitz et al. (S.D. Fla. 0:23-cv-61696-AHS), the court restricted Movant's Proposed Findings of Fact and Conclusions of Law (DE 315) after CMR moved to strike them; the court separately observed that "contradictory exhibits are a litigant's dream; they should never be stricken, they should be used to illustrate lack of credibility" (DE 310).

b. In Locality Bank v. Starboard Yacht Group, LLC (S.D. Fla. 0:26-cv-60068-AHS), Locality Bank seeks $934,994.28 from Movant individually.

c. In CACE-26-005811 (Broward County), Movant's personal property was wrongfully seized.

26. These parallel proceedings are offered as pattern context only. The relief requested in this Motion is grounded solely on the Seakeeper-record evidence and the FRCP 65(c) standard.

### D. Dissolution As to Wrongfully Seized Assets

27. In the alternative, Movant requests that the Court dissolve the injunction as to the specific assets that have been:

a. Stolen by third parties (SK26 26-221-0589 per SYG purchase records CON 000158; not in manufacturer D-82 — BSO Axon #02-2601-000152);

b. Wrongfully accused of theft when Seakeeper's own records show the unit is "still installed on the boat" (SK35 35-212-0428, 314-3 Lavorato email; D-82 p.2 cross-labels 0432/0428 — manufacturer internal scramble);

c. Rendered valueless by enterprise actors outside SYG's control.

28. An injunction cannot functionally compel SYG to deliver assets that are no longer in its possession or control. To the extent the injunction orders SYG to preserve or return units that have been stolen or seized, it is impossible to comply with and should be dissolved as to those items.

### E. Good-Faith Privacy Compliance and Redaction Review

29. To demonstrate utmost good faith and strict adherence to the Federal Rules of Civil Procedure (specifically Fed. R. Civ. P. 5.2(a) governing privacy protection), Movant has carefully reviewed all filings to ensure the redaction of any sensitive personal and financial identifiers. All submitted exhibits have been verified for accuracy against contemporaneous business records, and contain only relevant evidence.

30. This level of rigorous attention to compliance and accuracy stands in stark contrast to Plaintiff's unverified and internally contradictory pleadings.

_____

_____

## IV. RELIEF REQUESTED

WHEREFORE, Movant respectfully requests that this Court:

1. **INCREASE** the wrongful-injunction bond to an amount not less than **$555,000** (the verified value of in-possession factory-sealed inventory and at-risk units, as detailed in the accompanying Declaration, Exhibit A) or such other amount as the Court deems just and proper to compensate SYG for the actual harm caused by the injunction;

2. **DISSOLVE** the injunction as to the SK26 unit (stolen), SK35 #1 (seized and sold), and any other units no longer in SYG's possession or control;

3. **STAY** any contempt proceedings pending resolution of this Motion;

4. **AWARD** Movant his costs and reasonable attorney's fees; and

5. **GRANT** such other and further relief as this Court deems just and proper.

_____

_____

# SIGNATURE PACK — WRONGFUL-INJUNCTION BOND MOTION FILINGS

## Case No. 1:26-cv-01332-MJM (D. Md.)

## 1. SIGNATURE PAGE — MOTION TO INCREASE WRONGFUL-INJUNCTION BOND

Respectfully submitted this ___9___ day of ___June___, 2026.

**Charles Jacob Stratmann**

Proposed Intervenor, Pro Se

545 NE 17th Avenue

Fort Lauderdale, Florida 33301

(954) 873-8546

jake@starboardyacht.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion to Increase Wrongful-Injunction Bond and Memorandum of Law in Support has been served upon all parties of record by first-class mail and email on this ___9___ day of ___June___, 2026.

**Charles Jacob Stratmann**

# EXHIBIT INDEX

| Exhibit | Description | Bates |
| --- | --- | --- |
| A | Declaration of Charles Jacob Stratmann — Seakeeper Inventory & CMR Contradiction | SYG-107092 |
| B | 314-1 — Vrana Octopussy Project Management Email (Jeff Vrana to SYG, Oct 11, 2022) | CMR DE 314-1 |
| C | 314-2 — Stratmann Sales Email to Ivankovich (May 24, 2022) — $793,002 for 3 SK35 units | CMR DE 314-2 |
| D | 314-3 — Lavorato Subpoena Response (July 16, 2024) — "Unit 35-212-0428 is still installed on the boat" | CMR DE 314-3, Bates SYG-106744 |
| E | 314-4 — Estimate #2009-7329 — 3 SK35 Units + Humphree for Octopussy ($983,729.30) | CMR DE 314-4 |
| F | SYG-105822 to 105827 — TriSea SK35 Buy-Back Communications | SYG-105822–105827 |
| G | SYG-105854 — Chase Russell Cobia 33DC Warranty Resolution Email | SYG-105854 |
| H | SKR-000007 — Leatherwood Confirmation of 8 Seakeeper Units | SKR-000007 |
| I | SYG-105876–105877 — Ivankovich Per-Vessel Pricing Email | SYG-105876–105877 |
| J | Trial Transcript Excerpt — Ivankovich "Zero" Testimony at 122:5-6 | DE 312 |
| K | CON 000158 — Seakeeper "In Stock" Dealer Stock Confirmation | CON 000158 |
| L | BSO Axon Report — SK26 Theft Investigation #02-2601-000152 | BSO Axon |
| M | FLPD Report — SK35 Seizure/Sale Investigation #34-2512-209096 | FLPD |

_____

_____

*Motion prepared by Charles Jacob Stratmann, Pro Se.*