IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

SEAKEEPER, INC.,

Plaintiff,

v. Civil Action No. 1:26-cv-01332-MJM

STARBOARD YACHT GROUP, LLC,

Defendant.

Hon. Matthew J. Maddox

**DEFENDANT STARBOARD YACHT GROUP, LLC'S MOTION TO VACATE**

**ENTRY OF DEFAULT, OR IN THE ALTERNATIVE TO SET ASIDE**

**DEFAULT JUDGMENT, AND MEMORANDUM IN SUPPORT**

**(Rules 55(c) and 60(b), Fed. R. Civ. P.)**

Defendant Starboard Yacht Group, LLC ("SYG") moves pursuant to Federal Rule of Civil Procedure 55(c) to set aside the entry of default entered by the Clerk on June 4, 2026 (ECF No. 50), or in the alternative, pursuant to Federal Rule of Civil Procedure 60(b)(1) and (b)(3), to the extent the Court determines the June 4 entry constitutes a final default judgment. SYG also requests a twenty-one (21) day extension from the date of this Court's Order to retain Maryland-licensed counsel and file a responsive pleading. Good cause exists under each of the Fourth Circuit factors for Rule 55(c) relief. Should the Court apply Rule 60(b), the Pioneer four-factor test and the Schultz misconduct standard are each independently satisfied. The default resulted from a structural legal barrier -- not willful neglect. SYG has concrete, document-verified meritorious defenses. And SYG has acted with urgency since the moment it learned of the default.

## I. INTRODUCTION

This Court's docket reflects a story Seakeeper, Inc. wishes to tell: a former dealer who won't remove signs and take down websites. The documentary record tells a different story.

On December 2, 2025, exactly one year to the day after Seakeeper issued SYG's termination notice, the United States Patent and Trademark Office granted Seakeeper's own CEO -- Andrew Semprevivo -- U.S. Patent No. 12,326,735 covering gyro-interceptor integration technology. Seakeeper had been prosecuting that patent, in secret, for three years while SYG served as its authorized dealer. The termination did not follow from SYG's failure to perform. It followed from Seakeeper's need to eliminate a dealer who was selling the very product Seakeeper had just patented.

The remainder of the record confirms the same pattern. On December 30, 2024 -- the same day Seakeeper rejected SYG's growth plan and confirmed termination -- Seakeeper accepted a $50,000 wire from SYG. In January 2025, Seakeeper's training team invited SYG to a paid technical training event at its Tampa Training Center and billed SYG's active dealer account. In March 2025, Tom Cole, Seakeeper's own representative, issued a Seakeeper commissioning certificate bearing SYG's name. In October 2025, Seakeeper processed SYG's warranty claims. In April 2026, Seakeeper sent SYG monthly billing statements. A company that has actually terminated a dealer does not do any of these things.

SYG has a complete Answer, Affirmative Defenses, and Counterclaims ready to file upon vacatur. The Court's preference for decision on the merits, the absence of prejudice to Plaintiff, and the law of this Circuit all require that default be set aside.

## II. BACKGROUND

### A. The Parties

SYG is a Florida limited liability company with its principal place of business in Fort Lauderdale, Florida. Charles Jacob Stratmann is its Sole Member and Manager. From approximately 2017 through 2024, SYG served as an authorized Seakeeper dealer -- one of Seakeeper's top-performing dealers in the Southeast Florida market, winning Seakeeper Dealer of the Year in 2021, presented at the Miami Boat Show on February 14, 2022. SYG's Seakeeper revenue was $1,452,966 in 2021.

Seakeeper, Inc. is a manufacturer of marine gyro stabilizer equipment and related technology, and a wholly owned subsidiary of Madison Industries. Andrew Semprevivo is Seakeeper's President and CEO. Seakeeper's principal place of business is in California, Maryland, St. Mary's County.

### B. The Termination -- December 2, 2024

Seakeeper issued two irreconcilable communications on December 2, 2024:

Communication 1 (7:52 a.m.): A written email from Tom Cole (tcole@seakeeper.com) stating: "Seakeeper will not be renewing the dealer agreement with Starboard Yacht Group in 2025" and authorizing SYG to "continue business operations under the current agreement until January 31, 2025." This is a non-renewal under Section 71 of the Dealer Agreement, which requires 60 days' notice and allows a transition period.

Communication 2 (same day): A formal termination letter invoking Section 72.4 of the Dealer Agreement, stating termination "effective immediately" based on "adverse effect on goodwill." Section 72.4 is a for-cause provision requiring actual goodwill harm. The stated grounds -- "process proficiency, mission alignment, communication gaps, sales performance, outstanding balances" -- are Section 72.1 performance grounds requiring 15 days' written notice and an opportunity to cure. No cure notice was provided.

Two communications, same date, irreconcilably different: one authorizes continued operations through January 31, 2025; the other purports to terminate "effective immediately." Exhibit A (termination letter) and Exhibit B (Cole email) are attached to this Motion.

### C. The December 4, 2024 Reconsideration Meeting

Two days later, on December 4, 2024, Seakeeper participants Chad Hoey, Tom Cole, and Brad Mead conducted a 57-minute recorded meeting with Stratmann. The meeting was recorded and transcribed by Fireflies.ai (Meeting ID: NBFPCoN0l1pDbfgb). The Fireflies recap email was distributed to all Seakeeper participants at their corporate addresses.

The Fireflies action items documented reciprocal commitments:

- SYG: Develop and submit an updated strategic growth plan; prepare for a follow-up call.
- Seakeeper: Chad Hoey to review the plan; Hoey, Cole, and Mead to "reevaluate direction with Starboard Yacht Group after receiving the plan."

Seakeeper did not conduct the follow-up call. Seakeeper did not conduct the joint review. On December 30, 2024, Seakeeper rejected SYG's growth plan without providing the documented review it committed to perform. Exhibits P, Q, and R (Fireflies recap email, transcript, and Declaration of Fireflies Authenticity) are attached.

A party that has delivered an "effective immediately" termination does not hold a 57-minute reconsideration meeting, assign itself follow-up action items, and commit to reevaluate. Seakeeper's own conduct on December 4 is inconsistent with a final termination.

### D. The Patent Concealment

Beginning August 19, 2021, Seakeeper filed three patent applications for gyro-interceptor integration technology while SYG was its authorized dealer:

- Provisional Application 63/234,894 (August 19, 2021) -- granted February 4, 2025
- Non-provisional (filed July 22, 2022, Inventors: Gallagher, Semprevivo, Adams) -- granted June 10, 2025
- Non-provisional (filed July 29, 2022) -- granted as U.S. Patent No. 12,326,735 on December 2, 2025, one year to the day after SYG's termination notice

U.S. Patent No. 12,326,735 explicitly covers "adjustment of the engine steering angle to counter yaw moments produced by gyroscopic stabilization systems" -- the integration of interceptors with gyros. This is the core of SYG's proprietary SVICM methodology. Seakeeper's CEO and President, Andrew Semprevivo, is a named inventor. Seakeeper concealed this activity from SYG for over three years. Source: USPTO records (verified); Boating Industry reporting (August 2022); IDS #1796.

### E. The Viviere Contract -- The Smoking Gun of Bad Faith

On January 7, 2025 -- after the December 2 non-renewal email authorized continued operations -- SYG contracted with Vivere Adventures, Ltd. for installation of a Seakeeper 2 stabilizer on M/Y Formosa (RO #42289, contract price $78,209.77). Vivere paid in full.

On January 27, 2025, Tom Cole -- the same representative who had authorized continued operations through January 31, 2025 -- explicitly refused to ship the SK2: "Unfortunately, we are unable to fill this order at this time." Cole refused to ship while Seakeeper held approximately $30,000 in SYG funds. Cole's refusal made SYG's performance to Vivere impossible. Vivere sued SYG (Case No. 0:25-cv-61065-WPD, S.D. Fla.). SYG filed a third-party complaint against Seakeeper on January 12, 2026 (DE 31 in that action). The Tom Cole refusal-to-ship email is in evidence as Viviere DE 32-1, Exhibit D.

### F. The Financial Devastation -- Why There Is No Culpable Neglect

On November 10, 2025, a former commercial landlord -- Bluewater Reel Estate LLC -- conducted an auction that seized $1,302,128.34 in SYG specialized marine equipment, including two Seakeeper gyro stabilizers (SK35, Serial 221-0589, value $309,000; SK26, Serial 212-0428, value $265,000), a 287 Pursuit demo vessel ($225,000), a Genie Telehandler ($79,485, Serial GTH1014-19672), and hundreds of tools. The auction violated Florida Statute Sec. 715.109(2) -- only one notice was published rather than the required two consecutive weeks. The eviction judgment was $0.00 in damages; no writ of execution was issued. A replevin and civil theft action is pending in Broward County Circuit Court (CACE-26-005811, Judge Levenson), seeking treble damages of $3,906,385.02. Seakeeper's own General Counsel,

John Lavorato, confirmed one of the Seakeeper units was sold: "Tom sold it." Two law enforcement agencies are actively investigating -- Broward Sheriff's Office (Det. Amanda Vecchio, Axon #02-2601-000152) and Fort Lauderdale Police Department (Det. Michelle Stern, Case #34-2512-209096).

SYG's SBA EIDL loan is in default. SYG's operating capital is exhausted. SYG has been indigent since November 2025 as a direct result of this third-party conversion.

## III. LEGAL STANDARD

### A. Rule 55(c) -- Primary Standard

Fed. R. Civ. P. 55(c) provides that the Court may set aside an entry of default for "good cause." The Fourth Circuit traditionally applies a three-factor test examining: (1) whether the moving party has a meritorious defense; (2) whether it acted with reasonable promptness; and (3) whether the defaulting party was personally responsible for the default. Payne ex rel. Estate of Calzada v. Brake, 439 F.3d 198, 204 (4th Cir. 2006). In this District, the good-cause standard is frequently articulated as a six-factor inquiry, adding three additional elements: (4) the history of any dilatory action; (5) the prejudice to the non-defaulting party; and (6) the availability of less drastic sanctions. See, e.g., Securities & Exchange Comm'n v. Lee, No. RDB-23-01824, 2024 WL 1156681, at 2 (D. Md. Mar. 18, 2024); Pinpoint IT Servs., LLC v. Atlas IT Export Corp., 812 F. Supp. 2d 710, 716 (E.D. Va. 2011). Under either the three-factor or the six-factor formulation, SYG easily satisfies the requirements for relief. Courts "must consider all relevant circumstances," and additional factors such as prejudice to the non-defaulting party may be considered. Colleton Preparatory Acad., Inc. v. Hoover Universal, Inc., 616 F.3d 413, 417 (4th Cir. 2010). Rule 55(c) is construed liberally because courts in this Circuit "prefer to decide cases on their merits." Augusta Fiberglass Coatings, Inc. v. Fodor Contracting Corp., 843 F.2d 808, 810 (4th Cir. 1988). "Any doubt as to whether relief should be granted should be resolved in favor of the motion." Tolson v. Hodge, 411 F.2d 123, 130 (4th Cir. 1969).

### B. Rule 60(b) -- Alternative Standard

Should the Court determine that the June 4, 2026 entry constitutes a default judgment rather than a clerk's entry of default under Rule 55(a), Rule 60(b) provides the applicable standard. SYG satisfies two independent grounds:

Rule 60(b)(1) -- Excusable Neglect. The Supreme Court's four-factor test governs: (i) danger of prejudice to the opposing party; (ii) length of delay and its potential impact on judicial proceedings; (iii) the reason for the delay, including whether it was within the movant's reasonable control; and (iv) whether the movant acted in good faith. Pioneer Inv. Servs. Co. v.

Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993). All four factors favor SYG, as set forth in Section IV.E below.

Rule 60(b)(3) -- Fraud, Misrepresentation, or Misconduct. The Fourth Circuit requires the movant to demonstrate that the opposing party obtained the default through fraud, misrepresentation, or misconduct that prevented the movant from fully and fairly presenting its case. Schultz v. Butcher, 24 F.3d 626, 630 (4th Cir. 1994). A single channel of documented misconduct is sufficient. Seakeeper's coordinated conduct -- detailed in Section IV.F -- provides three independent channels. See also Square Constr. Co. v. Wash. Metro. Area Transit Auth., 657 F.2d 68, 71 (4th Cir. 1981) (deliberate withholding of relevant documentary evidence constitutes Rule 60(b)(3) misconduct). Rule 60(b)(3) motions must be filed within one year of the judgment. Id. at Rule 60(c)(1). This Motion is filed twenty-eight (28) days after the June 4, 2026 entry -- well within that limit.

The good-cause standard under Rule 55(c) is less rigorous than the Rule 60(b) excusable neglect standard. Colleton, 616 F.3d at 417 n.1. Either standard is met here.

## IV. ARGUMENT

### A. SYG Has Substantial Meritorious Defenses and Counterclaims

A meritorious defense requires only a presentation of facts sufficient to constitute a defense -- "not that success on the merits is a certainty." Augusta Fiberglass, 843 F.2d at 812. SYG's defenses are not theoretical. They are grounded in authenticated documentary evidence.

### 1. Post-Termination Dealer Treatment -- Six Instances of Authorized Conduct

After claiming to terminate SYG "effective immediately" on December 2, 2024, Seakeeper continued treating SYG as an active dealer for ten months across at least six documented instances of authorized commercial conduct:

(i) December 30, 2024 (28 days after "effective immediately" termination): On the same day Seakeeper rejected SYG's growth plan and confirmed termination effective January 31, 2025, Seakeeper accepted a $50,000 wire payment from SYG. A company that simultaneously terminates a dealer and accepts $50,000 from that dealer is engaged in contradictory conduct. (Ex. K.)

(ii) January 7, 2025 (36 days after "effective immediately" termination): SYG contracted with Viviere Adventures, Ltd. for a Seakeeper 2 installation (Repair Order #42289, $78,209.77 total). Viviere paid in full between January 7 and March 4, 2025. On January 27, 2025 -- still within the Cole-email authorization period through January 31 -- Tom Cole explicitly refused to

ship the SK-2 unit, stating "Unfortunately, we are unable to ship this order at this time." Seakeeper retained approximately $30,000 in SYG funds while refusing delivery. This refusal made SYG's performance to Viviere impossible and directly caused the Viviere lawsuit against SYG. (Ex. E, Ex. F.)

(iii) January 10-13, 2025 (39-42 days after "effective immediately" termination): Seakeeper billed SYG's active dealer account a $300 training registration fee (Invoice #92223) for technician James Levin (also known as Jim Lavin) to attend Seakeeper technical training in Tampa. SYG's CFO Brian Kenny booked the hotel and Levin used a SYG corporate credit card for travel expenses. Seakeeper accepted the training enrollment, processed the invoice on its dealer billing system, and conducted the training. (Ex. C.)

(iv) February 3, 2025 (63 days after "effective immediately" termination): Seakeeper specialist Karisa Asbury-House compiled SYG's complete 5-year sales data and provided it to SYG -- an act of active commercial cooperation inconsistent with a terminated relationship. (Ex. J.)

(v) March 2025 (approximately 90 days after "effective immediately" termination): Tom Cole issued an SK9 Commissioning Certificate verifying SYG's completed installation of a Seakeeper SK9 unit. Commissioning certificates are issued exclusively to authorized dealers who have completed a verified installation to Seakeeper's specifications. Issuance of a commissioning certificate is an official act of dealer authorization -- it certifies that the dealer's work meets Seakeeper's standards. (Ex. L, Bates EX-B-0002.)

(vi) October 2025 (approximately 10 months after "effective immediately" termination): Seakeeper processed SK26 warranty claims submitted by SYG. Warranty administration -- including claim intake, review, authorization, and parts fulfillment -- is a function Seakeeper performs exclusively for authorized dealers. Processing SYG's warranty claims ten months after the purported termination is the most direct evidence that Seakeeper continued treating SYG as a dealer. (Ex. M, Bates EX-I-0003.)

### 2. The Authorized Conduct Defeats the Willful Infringer Narrative

The record shows six instances of authorized dealer conduct spanning ten months after December 2, 2024: accepting payment (Dec 30), billing the dealer account for training (Jan 10-13), compiling sales data (Feb 3), issuing a commissioning certificate (Mar 2025), and processing warranty claims (Oct 2025) -- all while claiming to have terminated the relationship "effective immediately." A company that accepts a dealer's money, trains its technician, certifies its installations, and processes its warranty claims is not treating that dealer as terminated. Seakeeper cannot claim SYG was a willful infringer using marks without authorization while simultaneously performing the functions of an active dealer-manufacturer relationship.

Defense 2: The termination was procedurally defective. The December 2, 2024 communications are facially contradictory. One authorizes continued operations through January 31, 2025 (Section 71 non-renewal). The other purports to terminate "effective immediately" under Section 72.4. The formal letter cited performance grounds (process proficiency, mission alignment, sales performance) that fall under Section 72.1, which requires 15 days' notice and a cure opportunity. No cure period was provided. A procedurally defective termination is no termination, and without a valid termination, any trademark license revocation is itself invalid.

Defense 3: Patent concealment and unclean hands. Seakeeper filed three patents for competing marine technology between August 2021 and July 2022 without disclosing this to SYG. U.S. Patent No. 12,326,735 -- covering the precise integration methodology at the core of SYG's proprietary technique -- was granted on December 2, 2025, one year to the day after SYG's termination. Seakeeper's CEO is a named inventor. A plaintiff who secretly developed and patented the very technology it licensed to its dealer, then terminated that dealer upon patent grant, cannot invoke equity to enforce those same intellectual property claims.

Seakeeper's unclean hands extend beyond patent concealment. In May 2022, Seakeeper faced a product liability crisis when its factory-installed SK2 stabilizer on a customer's Cobia 33DC was found severely corroded due to defective installation. The manufacturer confirmed that "Seakeeper directed and installed at our facility this unit during production." (Ex. T, SYG-105844.) The customer -- Steven Ivankovich -- threatened to sue Seakeeper and to ensure that two boat brands he was importing would "never ever install a SeaKeeper." (Ex. T, SYG-105846.) Stratmann personally resolved the crisis, brokered a trade-in solution, and introduced Ivankovich directly to Seakeeper's sales team, generating $570,000+ in immediate sales and retaining Seakeeper's most valuable customer. Seakeeper responded by terminating the dealer who saved it from a seven-figure liability, patenting the integration methodology that dealer developed, and filing this lawsuit. This genesis event is part of the same unclean-hands pattern, not a separate RICO claim. (Ex. T.)

Defense 4: Nominative Fair Use and First Amendment Protections. Under Fourth Circuit law, any post-termination reference to "Seakeeper" on SYG's digital or physical platforms was a protected nominative fair use, which directly rebuts any likelihood of confusion and qualifies as a statutory defense under 15 U.S.C. Sec. 1115(b)(4). The Fourth Circuit rejects rigid multi-factor tests for nominative use, instead folding it into the standard likelihood of confusion inquiry. Rosetta Stone Ltd. v. Google, Inc., 676 F.3d 144, 154 (4th Cir. 2012). SYG used the wordmark solely to describe its historical role as an authorized dealer and its ongoing, lawful technical specialization in servicing and refitting Seakeeper-brand equipment. Truthful, non-misleading historical descriptions and statements of service compatibility are protected under the First Amendment and do not constitute trademark infringement. Radiance

Foundation, Inc. v. NAACP, 786 F.3d 272, 281 (4th Cir. 2015).

Defense 5: 14-Month Ride Agreement gap. Seakeeper's Complaint (ECF No. 1, ¶ 27) confirms that the Ride Agreement was not terminated until February 11, 2026 -- fourteen months after the claimed end of the dealer relationship. Seakeeper's own counsel admitted in a March 4, 2026 letter that the Ride Agreement was "inadvertently omitted" from the original termination. SYG was a valid authorized Seakeeper Ride dealer throughout the intervening period. Any use of the Seakeeper Ride mark during that period was by definition authorized.

SYG's counterclaims include breach of the dealer agreement (patent concealment; defective Section 72.4 termination), fraud in the inducement, tortious interference (manufactured sales decline, Kappock pipeline), Lanham Act Sec. 43(a) reverse palming-off (Seakeeper credited SYG's post-termination work to other dealers), unjust enrichment, and declaratory judgment of non-infringement. These counterclaims are supported by authenticated exhibits including Seakeeper's own email communications, invoice records, USPTO filings, deposition testimony, and commissioning certificates. The damages are substantial: $1,302,128.34 in seized assets, $78,209.77 in the Viviere contract, and loss of a business generating $1,452,966 in annual Seakeeper revenue at its peak.

### 3. The Ivankovich Transaction -- Context for Unclean Hands

To the extent Seakeeper's enforcement action is supported by testimonies or actions of third-party customers whose accounts were transferred post-termination, SYG notes that the course of dealing includes significant, uncredited contributions. Specifically, SYG resolved critical installation crises and brokered high-value accounts (such as the $570,000+ Ivankovich refit) that directly benefited Seakeeper's market standing. This historical context is offered solely as equitable background for SYG's unclean hands defense, demonstrating that Seakeeper's enforcement action is intertwined with a broader course of dealing that weighs heavily in favor of merits-based resolution. (Ex. T, Ex. U.)

### B. SYG Has Acted With Reasonable Promptness

SYG cannot appear pro se in this Court. Rowland v. California Men's Colony, 506 U.S. 194, 202 (1993). This is a structural legal barrier, not a choice. Upon learning of the default entry, SYG immediately undertook the following documented steps to obtain counsel:

- Submitted intake application to the Pro Bono Resource Center of Maryland (PBRC), info@probonomd.org;
- Submitted intake application to the D. Md. Attorney Admissions Office for pro bono referral;
- Submitted intake application to the University of Maryland IPEC Clinic (IPEC@law.umaryland.edu);

- Submitted intake application to Maryland Volunteer Lawyers Service (MVLS) via the online portal at mdoi.legalserver.org;
- Sent outreach to the University of Maryland Carey School of Law Federal Litigation Clinic;
- Sent outreach to the University of Baltimore School of Law Clinic.

This Motion is filed within thirty (30) days of the default entry (ECF No. 50, June 4, 2026) and before the Court-imposed deadline of July 7, 2026. This constitutes reasonable promptness as a matter of law. Consolidated Masonry & Fireproofing, Inc. v. Wagman Constr. Corp., 383 F.2d 249, 251 (4th Cir. 1967) (promptness assessed from time defaulting party learned of the entry).

Importantly, the requested twenty-one (21) day extension is tied to a concrete and active counsel-retention plan. SYG has prepared a trial-ready litigation briefing package--including a 73-paragraph Answer, eight Affirmative Defenses, and eight detailed Counterclaims--to minimize any onboarding delay. The 21 days will be utilized solely to allow SYG's active pro bono and legal clinic applications (specifically the Pro Bono Resource Center of Maryland and the D. Md. Admissions Office referrals) to complete their administrative conflict reviews, finalize lead counsel assignments, and enter their formal appearances in this Court. This is a finite, structured request to bridge the gap between active pro bono placement and formal appearance.

### C. The Default Is Not the Result of SYG's Culpable Conduct

Culpable conduct in this Circuit means something more than negligence -- it requires "flagrant bad faith" or "callous disregard of responsibilities." Lolatchy v. Arthur Murray, Inc., 816 F.2d 951, 953 (4th Cir. 1987). There is none here.

SYG's failure to respond was caused by a structural legal rule (Rowland) intersecting with financial devastation directly caused by third-party conversion. $1,302,128.34 in SYG's assets were seized and liquidated by Bluewater Reel Estate LLC in November 2025 in a proceeding that violated Florida law. Two law enforcement agencies are actively investigating. SYG's SBA EIDL loan is in default. SYG's operating capital is exhausted.

Stratmann has devoted substantial personal effort -- independently preparing a complete 73-paragraph responsive pleading, eight affirmative defenses, eight counterclaims, an exhibit index, and a full attorney briefing package -- but cannot file any of it without Maryland-licensed counsel. This is not neglect. This is a person doing everything a layperson can do, against the only barrier that law creates: the requirement of licensed counsel. Courts in this Circuit have consistently held that structural barriers, financial hardship, and good-faith compliance efforts preclude a finding of culpable conduct. Augusta Fiberglass, 843 F.2d at 811.

### D. No Prejudice to Plaintiff; Default Judgment Would Be Disproportionate

Seakeeper is represented by Faegre Drinker Biddle & Reath LLP -- an Am Law 100 firm with three attorneys from three offices assigned to this case. This action was filed on April 3, 2026. No discovery has commenced. The case is in its earliest stages. A twenty-one day extension to allow SYG to retain Maryland counsel imposes no cognizable prejudice on Plaintiff.

The alternative -- a default judgment on five trademark and breach-of-contract counts for a company whose non-response was caused by structural legal constraints and documented financial devastation -- would be grossly disproportionate. Augusta Fiberglass, 843 F.2d at 810 ("[T]he extreme sanction of default judgment should not be imposed when a lesser sanction would do.") The lesser sanction here is simple: twenty-one days.

### E. Rule 60(b)(1) -- Pioneer Four-Factor Analysis (Alternative)

Should the Court apply Rule 60(b)(1), all four Pioneer factors favor SYG:

(i) Danger of prejudice to Plaintiff. None. No discovery has occurred. The Preliminary Injunction (ECF No. 26) remains in full force regardless of this Motion. Seakeeper's ability to protect its trademarks is not diminished by permitting SYG to answer. Requiring Seakeeper to litigate its claims on the merits is not cognizable prejudice. Augusta Fiberglass, 843 F.2d at 811.

(ii) Length of delay and impact on proceedings. Minimal. This Motion is filed within thirty (30) days of the default entry and before the Court-imposed July 7 deadline. The case has not advanced to scheduling, discovery, or trial planning. Vacating the default resets the case to its natural posture -- a pleading-stage matter weeks old.

(iii) Reason for delay -- not within movant's control. An LLC cannot appear pro se in federal court. Rowland v. California Men's Colony, 506 U.S. 194, 202 (1993). SYG's inability to retain Maryland-licensed counsel was directly caused by Seakeeper's own conduct: the Viviere induced-reliance scheme destroyed SYG's operating capital; sixteen months of simultaneous authorization and trademark prosecution prevented counsel from assessing the case cleanly; and Seakeeper's coordinated enforcement created a multi-jurisdictional pro se burden across 24+ cases. The failure to file a timely answer was not within SYG's control -- it was the consequence of circumstances Seakeeper helped engineer.

(iv) Good faith. SYG's good faith is documented and undisputed: (a) SYG appeared at the June 3, 2026 show-cause hearing (ECF No. 44); (b) SYG filed ECF No. 18-1 (pro bono counsel motion) before the default was entered; (c) SYG submitted six documented pro bono intake applications after learning of the default; (d) SYG prepared a complete 73-paragraph Answer with eight counterclaims and eight defenses; and (e) SYG has pursued full compliance with the Preliminary Injunction. No bad faith is present.

### F. Rule 60(b)(3) -- Schultz Misconduct Nexus (Alternative)

Should the Court apply Rule 60(b)(3), Seakeeper's coordinated misconduct directly prevented SYG from mounting a timely defense through three documented channels:

Channel 1 -- Viviere Induced-Reliance Devastation. Tom Cole's December 2, 2024 email authorized SYG to continue operations through January 31, 2025. In direct reliance on that authorization, SYG contracted with Viviere Adventures, Ltd. on January 7, 2025 (RO #42289, $78,209.77). On January 27, 2025 -- while retaining approximately $30,000 in SYG funds -- the same Tom Cole refused to ship the ordered SK2 unit. This refusal made performance impossible, triggered the Viviere lawsuit (0:25-cv-61065-WPD), destroyed SYG's operating capital, and resulted in the multi-front financial devastation that made retaining Maryland counsel impossible. Schultz, 24 F.3d at 630 (misconduct that prevents fair defense supports 60(b)(3) relief). Ivankovich subsequently testified under oath at the February 23, 2026 trial in the related Octopussy proceeding (0:23-cv-61696-AHS, S.D. Fla.) that SYG performed "Zero" Seakeeper installations for his companies (Tr. 122:5-6) -- directly contradicted by project reports documenting eight Seakeeper units installed across six of his vessels. (Ex. U, SKR-000007.)

Channel 2 -- Coordinated Multi-Front Litigation. Seakeeper's counsel, Faegre Drinker Biddle & Reath LLP, filed this action on April 3, 2026. Separately, Akerman LLP -- counsel for Seacoast National Bank -- filed SCB v. SYG (0:26-cv-60289-WPD) on February 2, 2026, exactly 63 days after Seakeeper's termination. The simultaneous trademark enforcement and vessel foreclosure proceedings, prosecuted by connected counsel networks, imposed a multi-jurisdictional pro se burden that made timely response to any single action structurally impossible. Coordinated litigation designed to exhaust a pro se respondent supports a finding that the opponent's conduct prevented full and fair presentation. Square Constr., 657 F.2d at 71.

Channel 3 -- Patent Concealment Destroying Commercial Position. Seakeeper filed three patent applications for gyro-interceptor integration technology (2021-2022) without disclosure, granted U.S. Patent No. 12,326,735 on December 2, 2025 -- one year to the day after SYG's termination notice -- then filed this action four months later. This concealment eliminated SYG's competitive position, destroyed the business value that would have funded legal defense, and constitutes the kind of inequitable conduct that Rule 60(b)(3) was designed to address. A plaintiff that secretly patents its dealer's methodology, terminates the dealer upon patent grant, and sues for infringement while concealing the causal connection between the patent and the termination has obtained the default through misrepresentation by omission.

## V. DECLARATION OF CHARLES JACOB STRATMANN IN SUPPORT OF MOTION

I, Charles Jacob Stratmann, declare under penalty of perjury pursuant to 28 U.S.C. Sec. 1746

Should the Court apply Rule 60(b)(3), Seakeeper's coordinated misconduct directly prevented SYG from mounting a timely defense through three documented channels:

Channel 1 -- Viviere Induced-Reliance Devastation. Tom Cole's December 2, 2024 email authorized SYG to continue operations through January 31, 2025. In direct reliance on that authorization, SYG contracted with Viviere Adventures, Ltd. on January 7, 2025 (RO #42289, $78,209.77). On January 27, 2025 -- while retaining approximately $30,000 in SYG funds -- the same Tom Cole refused to ship the ordered SK2 unit. This refusal made performance impossible, triggered the Viviere lawsuit (0:25-cv-61065-WPD), destroyed SYG's operating capital, and resulted in the multi-front financial devastation that made retaining Maryland counsel impossible. Schultz, 24 F.3d at 630 (misconduct that prevents fair defense supports 60(b)(3) relief). Ivankovich subsequently testified under oath at the February 23, 2026 trial in the related Octopussy proceeding (0:23-cv-61696-AHS, S.D. Fla.) that SYG performed "Zero" Seakeeper installations for his companies (Tr. 122:5-6) -- directly contradicted by project reports documenting eight Seakeeper units installed across six of his vessels. (Ex. U, SKR-000007.)

Channel 2 -- Coordinated Multi-Front Litigation. Seakeeper's counsel, Faegre Drinker Biddle & Reath LLP, filed this action on April 3, 2026. Separately, Akerman LLP -- counsel for Seacoast National Bank -- filed SCB v. SYG (0:26-cv-60289-WPD) on February 2, 2026, exactly 63 days after Seakeeper's termination. The simultaneous trademark enforcement and vessel foreclosure proceedings, prosecuted by connected counsel networks, imposed a multi-jurisdictional pro se burden that made timely response to any single action structurally impossible. Coordinated litigation designed to exhaust a pro se respondent supports a finding that the opponent's conduct prevented full and fair presentation. Square Constr., 657 F.2d at 71.

Channel 3 -- Patent Concealment Destroying Commercial Position. Seakeeper filed three patent applications for gyro-interceptor integration technology (2021-2022) without disclosure, granted U.S. Patent No. 12,326,735 on December 2, 2025 -- one year to the day after SYG's termination notice -- then filed this action four months later. This concealment eliminated SYG's competitive position, destroyed the business value that would have funded legal defense, and constitutes the kind of inequitable conduct that Rule 60(b)(3) was designed to address. A plaintiff that secretly patents its dealer's methodology, terminates the dealer upon patent grant, and sues for infringement while concealing the causal connection between the patent and the termination has obtained the default through misrepresentation by omission.

## V. DECLARATION OF CHARLES JACOB STRATMANN IN SUPPORT OF MOTION

I, Charles Jacob Stratmann, declare under penalty of perjury pursuant to 28 U.S.C. Sec. 1746

that the following is true and correct:

1. I am the Sole Member and Manager of Starboard Yacht Group, LLC.

2. SYG received the Clerk's Notice of Default (ECF No. 51) on or around June 4, 2026. I immediately undertook efforts to retain Maryland-licensed counsel, as described in Section IV.B above.

3. All facts regarding Seakeeper's post-termination authorized conduct in Sections 5.12 and 5.13 are based on my personal review of SYG's authenticated Microsoft 365 email archive, bank records, and business records. The specific emails, invoices, commissioning certificates, and wire confirmations referenced exist and are available for production.

4. Invoice 92223, referencing "Tampa Training" and charging $300, is a genuine Seakeeper invoice received by SYG. It remained on Seakeeper's active billing statements as of June 15, 2026.

5. The $50,000 wire to Seakeeper on December 30, 2024, and the approximately $30,000 in retained funds related to the Viviere transaction, are based on SYG's bank records and Seakeeper's own communications.

6. The Fireflies transcript of the December 4, 2024 meeting (Meeting ID: NBFPCoN0l1pDbfgb) is a genuine, unaltered record of that meeting, as authenticated in the Declaration of Fireflies Authenticity executed February 17, 2026, attached as Exhibit R.

7. The financial condition described in Section II.F is accurate. SYG has no operating capital. Its SBA EIDL loan is in default. The Bluewater Reel Estate LLC asset seizure is the subject of pending litigation (CACE-26-005811, Broward County Circuit Court).

8. The pro bono outreach efforts described in Section IV.B are genuine. I have personally submitted each listed intake application. To date, no attorney has been retained.

9. I have prepared a complete Answer, Affirmative Defenses, and Counterclaims ready to be reviewed, finalized, and filed by counsel upon vacatur.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 7th day of July, 2026, at Fort Lauderdale, Florida.

/s/ Charles Jacob Stratmann

Charles Jacob Stratmann

Sole Member & Manager, Starboard Yacht Group, LLC

Page 13

## VI. CONCLUSION

For the foregoing reasons, SYG respectfully requests that the Court grant one of the following alternative forms of relief:

1. Primary -- Rule 55(c): Set aside the Clerk's entry of default entered on June 4, 2026 (ECF No. 50) for good cause, consistent with Payne, Colleton, Augusta Fiberglass, and Tolson;

2. Alternative -- Rule 60(b)(1): Vacate the June 4, 2026 entry as a default judgment due to excusable neglect under the Pioneer four-factor test, all factors of which favor SYG;

3. Alternative -- Rule 60(b)(3): Vacate the June 4, 2026 entry as a default judgment obtained through Seakeeper's fraud, misrepresentation, and misconduct that prevented SYG from fully and fairly defending this action, under Schultz and Square Construction;

4. In all cases: Grant SYG twenty-one (21) days from the date of the Court's Order to retain Maryland-licensed counsel and file an Answer, Affirmative Defenses, and Counterclaims.

The facts of this case -- a manufacturer that secretly patented competing technology while terminating its best-performing dealer, continued to treat that dealer as authorized for sixteen months after the claimed termination, then engineered the financial collapse that made timely response impossible -- deserve to be heard on the merits. The Payne factors, the Augusta Fiberglass policy, the Pioneer equitable analysis, and the documented record all point in one direction: vacate.

Respectfully submitted,

/s/ Charles Jacob Stratmann
Charles Jacob Stratmann
Sole Member & Manager, Starboard Yacht Group, LLC
545 NE 17th Avenue
Fort Lauderdale, Florida 33301
Telephone: (954) 873-8546
Email: jake@starboardyacht.com

Appearing specially and solely for the purpose of this Motion, pending retention of Maryland-licensed counsel

Dated: July 7, 2026

## CERTIFICATE OF SERVICE

S | Seakeeper Refit Database screenshots (June 30, 2026) | Exhibit_1_Seakeeper_Refit_Database_20260630.pdf

T | Ivankovich Genesis Event -- Cobia SK2 corrosion, trade-in, $570K+ Octopussy refit | EX-T_W1007.pdf (Bates SYG-108319-108320)

U | Ivankovich Trial Contradiction -- eight installations across six vessels | EX-U_W1007.pdf (Bates SYG-108321-108328)